[Civ. No. 19427. Second Dist., Div. Three. Apr. 13, 1953.]

STANLEY S. STONAKER et al., Petitioners, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; BYRON PEEBLER et al., Real Parties in Interest.

A. Brigham Rose for Petitioners.

No appearance for Respondent.

Roland Maxwell and Paul H. Marston for Real Parties in Interest.

WOOD (Parker), J.—Proceeding in certiorari to annul orders of the superior court adjudging petitioners, guilty of contempt of court for violation of an injunction.

On January 5, 1950, Byron Peebler and Ethel M. Peebler obtained judgment for $10,722.98, as damages for malicious prosecution, against petitioners herein J. M. Danziger and Edith W. Danziger. That judgment was also against one Hutchinson, but on appeal the judgment was reversed as to him. (*Peebler* v. *Danziger,* 104 Cal.App.2d 614 [232 P.2d 301].) Petitioners herein Stanley S. Stonaker and Melville E. Farmer were not parties in said action.

On October 8, 1951, the sheriff sold to the Peeblers at execution sale (under a writ of execution issued upon said judgment) all the right, title and interest of J. M. Danziger and Edith W. Danziger in certain cemetery property. (Hereinafter more particularly described.)

On November 15, 1951, Byron Peebler filed his affidavit for an order requiring said Danzigers, Hutchinson, Stonaker and Farmer, doing business as Graceland, a corporation, to show cause why they should not be enjoined from permitting interments in said cemetery property during the period for redemption of the property after said execution sale. On November 29, 1951, an order to show cause was issued requiring said persons, except Farmer, to show such cause on December 17, 1951. On December 14th, the attorneys for the Peeblers and Attorney Rose, representing the Danzigers and Stonaker, stipulated in writing (1) that Attorney Rose thereby entered a general appearance for the Danzigers and

Stonaker, and (2) that the hearing on the order as to the Danzigers and Stonaker be continued to January 4, 1952. The order to show cause was served on Hutchinson but he did not appear on said December 17th, and an injunction, as prayed for in the affidavit of Byron Peebler, was granted by Judge Swain as to Hutchinson upon the filing of a $500 bond.

The order to show cause came on for hearing on January 4th before Judge Patrosso, and said Danzigers and Stonaker filed written objections to the jurisdiction of the court to hear said order to show cause. No affidavit, in reply to the affidavit of Byron Peebler, was filed, and no evidence in addition to the Peebler affidavit was introduced at the hearing on the order to show cause. The attorney for the Danzigers and Stonaker called the judge's attention to the objections which had been filed. The matter was then submitted for decision.

On January 8th, the following minute order was made: "Order to show cause re preliminary injunction, having been heretofore submitted January 4, 1952, the court now orders: Injunction is ordered restraining defendants, their and each of their servants, agents and employees from interring any bodies in any portion of the property sold upon execution issued upon the judgment lien not previously sold for burial purposes to third persons. In other respects, application is denied. Attorney for plaintiff is to prepare a formal order."

On January 22, 1952, the judge made the formal injunction order which provided: "It Is Hereby Ordered, that the said Edith W. Danziger and J. M. Danziger, the agents, servants and employees of them or either of them, including Stanley S. Stonaker and Frances A. Stonaker, are enjoined and restrained either directly or indirectly from interring or permitting the interment of any bodies in any portion of the following described property situated in the County of Los Angeles . . . [here is legal description by metes and bounds of certain real property] not sold for burial purposes to third persons previous to October 8, 1951. Dated: January 22, 1952."

A copy of said injunction was served on February 8, 1952, on each of the following named persons: J. M. Danziger, Edith W. Danziger and Stanley S. Stonaker. A copy thereof was served on Melville E. Farmer on February 20, 1952.

On May 1, 1952, Byron Peebler filed his affidavit for an order requiring the Danzigers, Stonaker and Farmer to show

cause why they should not be adjudged to be in contempt of court by reason of violation of said injunction. The affidavit stated that said injunction (containing said provision hereinabove recited) had been duly made on said January 22, 1952; copies of the injunction were served on the Danzigers, Stonaker and Farmer on certain dates (as hereinabove stated); affiant is informed and believes and therefore alleges that said Farmer is, and since said January 22d has been an agent and employee of "Edith W. Danziger and/or J. M. Danziger"; since said January 22d the affiant has seen Farmer on the premises many times; since said date the Danzigers, Stonaker and Farmer have been in charge of and have supervised all cemetery operations on said premises; said persons interred and permitted the interment of certain bodies (the names of the decedents being stated) in said real property on the following dates in 1952: February 15, 21, 28, March 14, 17, 20, 22 and 27; affiant is informed and believes and therefore alleges that none of the burial spaces in which said bodies were interred was sold previous to October 8, 1951; that a person who purchased burial space for the burial on February 15th (burial of Mr. Huntley) told affiant that she came to affiant's office to purchase a space but no one was there and she went to the adjoining property (which is the cemetery property involved herein) and purchased the burial space; that the purchaser of said space also stated that the purchase was made after October 8, 1951, and that Farmer and Stonaker both participated in said interment; Farmer supervised the burial of Mr. Chamberlain on February 21st, and Mrs. Chamberlain told affiant that she bought that grave after October 8, 1951; after October 8, 1951, certain persons visited affiant and asked about the purchase of a grave for the interment on February 28th (Mr. Tedlock); Farmer supervised the interment on March 14th (Mrs. McGregor); before said interment of March 17th (Mr. Lloyd) affiant received a telephone call from a person who asked the price of a burial space in affiant's cemetery for the burial of said decedent; Mr. and Mrs. Schoonover, the parents of the person who was buried on March 20th, told affiant on the day after the funeral that they had contracted for the grave and for five other graves after October 8, 1951; a person told affiant that she purchased a grave for the interment on March 22d (Mr. Laird) after October 8, 1951; Stonaker supervised the interment on March 27th (Mr. Sharp—the date of interment was changed, in a later affidavit, to March 28th); and affiant is

informed and believes and therefore alleges that all the acts of said persons, Danzigers, Stonaker and Farmer, described in said affidavit, were done with the knowledge and consent of each and all of said persons and at the direction of each and all of them.

On May 1, 1952, an order was made requiring the Danzigers, Stonaker and Farmer to show cause why they should not be adjudged guilty of contempt of court for disobeying said injunction of January 22d, which injunction and disobedience are described in the affidavit of Byron Peebler. It was further ordered therein that a copy of said affidavit, attached to said order, should be served on each of said persons.

J. M. Danziger stated in his affidavit, in response to the affidavit of Byron Peebler, as follows: that he denied that he has or ever had any right, title or interest to any part of the property described in the Peebler affidavit, that he denied that he had conducted or carried on any operations or business within said cemetery since long before the date of the judgment in said action (the judgment was entered January 5, 1950); denied that Stonaker or Farmer was acting for him or had ever acted for him in any operations within or concerning said cemetery property.

Mrs. Danziger stated in her affidavit that: since before the date of said judgment she has not had any right, title or interest in any part of said cemetery property; since the levy of execution no one has acted as her agent or employee in connection with any operations on said property, and she has not at any time since said levy conducted any cemetery or business operations within or concerning said cemetery property; Stonaker or Farmer has not been, and is not, her agent or employee.

Stonaker stated in his affidavit that: he has not been a party to said action (the action for damages); he was examined in supplementary proceedings, and an order was made that he had nothing in his possession or under his control subject to levy or lien in connection with said judgment; that he "submits" that he is not the agent of Mr. or Mrs. Danziger and that he is not acting for any of the parties to said action; he "submits" that if he ever appeared at the cemetery premises it was because he was and had for a long time acted as the accountant for Graceland, Inc., a corporation having an office on said premises; he has had nothing to do with any of the burials mentioned in the affidavit of Byron Peebler.

Farmer stated in his affidavit that: he was served with a copy of the order to show cause *in re* contempt; that no other papers have been served upon him; since May 1, 1951, he has been executive vice-president of Graceland, Incorporated; he was not a party to said action; he has not been cited previously in connection with any of the matters involved in said action; he has never been an agent or employee of said Danzigers or either of them; he "submits" that he has never seen Mrs. Danziger, and he has not seen or communicated with J. M. Danziger for over six years preceding the making of said affidavit; that Graceland, Incorporated, an accredited cemetery authority, has been long prior to October 8, 1951, the owner in fee and in control and possession of all cemetery lots referred to in the Peebler affidavit in respect to which certain burials allegedly took place; said Graceland owns said lots free and clear of any claim of said plaintiff Peebler; affiant never permitted, or had anything to do with interring any body, "to which burial spaces and lots Graceland, Incorporated, a recognized cemetery authority, did not have title or right to inter . . . bodies of anyone long prior to October 8, 1951"; he "submits" that any acts on his part, whether alleged in the Peebler affidavit or otherwise, were not done as an agent or employee of the Danzigers or Stonaker or anyone employed or acting at their behest; his activity has been solely that of an officer of Graceland; said corporation has owned, long prior to said October 8th, burial space in said cemetery property; that if there is any controversy about the title of Graceland in whose behalf he had been acting, then he and Graceland should have their day in court in an independent proceeding and not as citees in said action referred to herein.

In a counteraffidavit made by Byron Peebler, it was stated: that in 1945 Mrs. Danziger alleged in a complaint filed in the superior court that she was the owner of the cemetery property involved herein; on May 1, 1950, she filed with the sheriff an objection to the proposed sale of said property under execution; on the hearing of said objection, Stonaker testified that he was employed by Mrs. Danziger in 1949 to check the burial cards and reissue burial certificates for anyone buried there; that in January, 1951, Stonaker testified in supplementary proceedings that: he was employed by Mrs. Danziger in 1949 as an accountant; his work was carried on at the cemetery; Mrs. Danziger was then, and for several months had been, in Italy; that the corporation, Graceland, was his

personal business and he owned the company; he acquired Graceland from a stockholder; the Graceland Corporation which he claimed to own is the old defunct corporation ("Graceland, a corporation," was in bankruptcy in 1943); he had been charging $2.00 an hour for his accounting work; she had paid him $100 on account in 1949; that is all he received; he was instructed by Mrs. Danziger that if the owner of a non-perpetual-care certificate presented it, he should issue a perpetual-care certificate to that person; when he signed such a certificate he signed it as follows: "E. W. Danziger, Stanley S. Stonaker, Secretary"; an abstract of said judgment (for damages) was recorded on February 10, 1950. Mr. Peebler stated further in his affidavit that he is informed and believes and therefore alleges: that Mrs. Danziger has not made any conveyance of her interest in said property other than the purported conveyance of burial spaces therein; that she has not conveyed any interest in said property to Graceland, Inc. Mr. Peebler also included in his affidavit various alleged quotations of testimony given by J. M. Danziger in the trial of said action for damages. Such quotations pertain to certain records of the cemetery and to the auditing by Stonaker. He also stated in his affidavit that he and Mrs. Peebler observed the practices of Stonaker in carrying on the cemetery operations; that Stonaker measures the graves, does the preliminary digging, places and removes chairs, and directs those participating in the funeral ceremonies; Stonaker also sweeps markers and sets vases for flowers; affiant saw Stonaker, Farmer and others lower the casket at said interment on February 15.

At the hearing upon the order to show cause *in re* contempt, Mrs. Peebler testified that: she lives in a house that is at the entrance to a 5-acre parcel of cemetery property known as "Olive Lawn Memorial Park"; the office of that cemetery adjoins the house, and an "L-shaped" parcel of cemetery property known as "Graceland Cemetery" adjoins two sides of Olive Lawn Memorial Park; the entrances to the two cemeteries are about 100 feet apart, and the names of the two cemeteries are at the entrances; she first saw Stonaker on the "L-shaped" property about the first part of 1950; on many occasions she has seen Stonaker locate the boundaries of graves by doing the preliminary digging; she has also seen him place the chairs and carpets around the graves and help lower caskets; she first saw Farmer on that cemetery property about June, 1950; he does "about the same thing Mr. Stonaker does";

she "kept track of every funeral they have had"; she made notations in a book regarding burials in the "L-shaped" cemetery property, and regarding persons who assisted in the burials; she made the notations on the day of the burials, except the notations as to the names of decedents; she obtained the names of the decedents from the Bureau of Vital Statistics, and then she wrote those names in the book; it was necessary for her to refresh her memory by referring to the book. She testified further, with regard to the funerals on the dates set forth in the affidavit of Byron Peebler, that she observed all of those funerals, except the ones on February 15th and 21st; that on February 28th, Stonaker and Farmer helped carry and lower the casket; Farmer took care of the funeral on March 14th or 15th (Mrs. McGregor), but the witness did not remember what he did; she did not remember whether she observed a funeral on March 17th; on March 22d, at the funeral of Mr. Laird, she saw Farmer and Stonaker set out the chairs, put flowers by the grave, lower the casket, and take the carpets away; also on March 22d (funeral of Mr. Fisk), she saw Stonaker and Farmer show the location of the grave and saw them fold the chairs. She also testified that she was present in court in May, 1950, and heard Stonaker testify at the hearing of Mrs. Danziger's objection to the proposed sale under execution—her claim that the property was exempt from execution. Counsel for the Peeblers, over the objection of opposing counsel, then read a page of the reporter's transcript of that hearing (purportedly testimony of Stonaker to the effect that Mrs. Danziger had employed him), and asked her if Stonaker had so testified. She replied in the affirmative. She also testified that she heard Stonaker testify in supplementary proceeding in January and March, 1951. Counsel for the Peeblers, over the objection of opposing counsel, then read three portions of the reporter's transcript in those proceedings (purportedly testimony of Stonaker), and asked her if Stonaker had so testified. She replied in the affirmative. Said portions consisted, respectively, of 5, 17, and 10 pages of the transcript. Those portions of said transcript were in substance to the same effect as the statements in Byron Peebler's counteraffidavit regarding the testimony of Stonaker in said proceedings.

Mrs. Phillips, a witness called by counsel for the Peeblers, testified that a few days after the burial of her father (Mr. Laird) on March 22, 1952, Farmer came to her home to collect for opening and closing the grave; Farmer said that the ceme-

tery "was in court," and that Peebler would tell her that he (Peebler) owned it, but she should not pay any attention to what he said. She testified further that Farmer handed to her an invoice, at the top of which were the printed words: "Graceland, Inc."; when Farmer came to her house about April 4, 1952, she paid him $30 and he gave her a receipt which is signed "Graceland Inc M E Farmer"; she talked with Farmer again at the cemetery about April 7th, and he wanted her to buy five graves for an investment; while she was talking to Farmer, Stonaker came out with a map and told her that she could have "these graves, which I bought"; she bought two graves, and Stonaker gave her a card with some penciled notations on it "to show me where our graves were, my father's and ours"; in the mail she received a book, dated April 7, 1952, which was entitled "Memorial Property Purchase Account." On the inside of the front cover of the book, and also on the first page, there are rubber-stamped words as follows: "Purchase Contract Memorandum Graceland, Inc." Also on the first page of the book, there is typewriting as follows: "Burial-right Ownership Certificate #1057 has been issued in the name of:—Ruth Phillips— . . ." The writing is signed: "Graceland Cemetery, Stanley S. Stonaker." Opposite said signature there are rubber-stamped words: "Graceland, Inc."

Mr. McGregor, a witness called by counsel for the Peeblers, testified that on March 13, 1952, he bought a lot for the burial of his wife; when he bought the lot he talked to Stonaker at the cemetery; he told Stonaker that his mother was buried there and he wanted his wife buried beside her; he bought the lot beside his mother's grave, and Stonaker gave him a receipt; Stonaker also delivered to him a document which recited that Graceland, Inc., assigned and conveyed to Mr. McGregor a certain burial place in Graceland Cemetery (which space was within said L-shaped parcel); that he (witness) did not surrender a prior ownership certificate. On that document there are rubber-stamped words as follows: "Surrender of Prior Ownership Certificate" and "Transfer." The said receipt was signed "Graceland S. S. Stonaker." Also upon the receipt were the words: "Transfer Resale."

Mrs. Chamberlain, a witness called by counsel for the Peeblers, testified that her husband was buried in Graceland Cemetery on February 21, 1952; she bought the burial lot on February 16th; about six weeks after the burial, Farmer came to her home and said that it was necessary that she pur-

chase a stone for her husband's grave; she asked him who owned the cemetery; he said that she had nothing to worry about, that it would all be straightened out.

None of the citees testified. A certificate of the Secretary of State, which was offered in evidence by the citees, was received in evidence. That certificate, dated February 23, 1951, stated in effect that the name ''Graceland'' does not resemble the names of other corporations so closely as to tend to deceive, and that said name is reserved for 30 days for the exclusive use of the applicants for the certificate.

Each citee was adjudged guilty of contempt of court and was sentenced to five days in the county jail, fined $500 and ordered to serve one day in jail for each $2.00 thereof remaining unpaid.

Petitioners contend that: (1) the affidavit, upon which the order to show cause *in re* contempt was based, did not state facts sufficient to constitute contempt of court, in that, certain allegations were made upon information and belief; (2) the evidence at the hearing on the order to show cause established that the transactions referred to were not the acts of any of the defendants in said action for damages or of their agents or employees, that is, the transactions were not the acts of J. M. or Edith W. Danziger or of their agents or employees; (3) neither Stonaker nor Farmer was a party to said action; (4) the injunction is a nullity, in that, (a) it was a preliminary injunction and did not require the giving of a bond, and (b) it was an attempt, by way of order to show cause, to reopen an action in which a judgment for money had become final and convert the action into one for an injunction involving additional parties without requiring pleadings and without giving the parties an opportunity to have a trial; (5) the affidavit *in re* contempt was not served on Farmer; (6) there was no evidence that ownership in any of the lots, where any of the burials took place, was in any person other than the corporate entity, Graceland, a corporation; (7) there was no evidence that any of said lots had not been sold to a third person prior to October 8, 1951; (8) under statutory provisions, only a corporation can perform cemetery operations; (9) Stonaker had nothing to do with said burials except in the capacity of an accountant for Graceland, Inc.; (10) Farmer had nothing to do with any burial in said cemetery except in instances where the burial space was the property of Graceland, Inc., and whatever activities he had in connection with the cemetery were ex-

clusively related to the business of said corporation of which he was executive vice-president; (11) and long prior to October 8, 1951, Graceland, Inc., owned said burial spaces, mentioned in Byron Peebler's affidavit, free and clear of any claim of the Peeblers.

Under the provisions of the injunction, the Danzigers, Stonaker, Farmer and their agents were enjoined from interring or permitting the interment of any bodies in any portion of the L-shaped cemetery property "not sold for burial purposes to third persons previous to October 8, 1951." Graceland, Inc., was not named expressly in the injunction as one of those enjoined. The documentary evidence, with respect to the burial spaces sold after said October 8th to the persons mentioned in the Peebler affidavit, shows that the sales were made in the name of Graceland, Inc., as seller. The receipt and assignment, with respect to the sale to Mr. McGregor, indicate that the space sold to him had been sold previously. The evidence was sufficient to prove that, after said October 8th, Stonaker and Farmer had aided in the interment of bodies in said property. There was not sufficient proof, however, that any portion of the property, where the bodies were buried, had not been sold for burial purposes to a third person previous to said October 8th. Under the evidence here, it might well be that said burial spaces had been sold before said date, and that the sales made after said date, in the name of Graceland, Inc., represented resales or transfers by former purchasers. A contempt of court proceeding is of a criminal nature and summary character. (*Hotaling* v. *Superior Court,* 191 Cal. 501, 504 [217 P. 73, 29 A.L.R. 127].)

The findings in a contempt of court proceeding are to be strictly construed in favor of the accused and the presumption in favor of the regularity of proceedings and judgment does not apply in contempt matters. (*Groves* v. *Superior Court,* 62 Cal.App.2d 559, 568 [145 P.2d 355].) It is true there was evidence (counteraffidavit of Mr. Peebler) that: in 1943, in the bankruptcy proceedings of "Graceland, a corporation," the bankrupt did not claim any interest in said cemetery property; in 1945, Mrs. Danziger alleged in a complaint that she was the owner of the cemetery property involved herein; in May, 1950, she claimed that said property was exempt from execution. Such evidence regarding ownership in 1943, 1945 and 1950, is not determinative, of course, as to the condition of title in 1951. It is not to be presumed in this proceeding that the condition of the title, as

it existed in said prior years, continued to be the same condition until the execution sale on October 8, 1951. Various changes in the matter of ownership of the property might have occurred after said dates in 1943, 1945 and 1950. The evidence was not sufficient to support a finding of violation of the injunction.

By reason of the above conclusion, it is not necessary to discuss the question of admissibility of the long excerpts of alleged testimony of Stonaker (in former proceedings) which were read to the witness, Mrs. Peebler. Also, by reason of said conclusion, it is not necessary to discuss other contentions of the citees.

The orders and judgments adjudging said citees (the Danzigers, Stonaker and Farmer) guilty of contempt of court are annulled.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied May 1, 1953, and real parties' in interest petition for a hearing by the Supreme Court was denied June 11, 1953.